## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VLADIMIR GUSINSKY REVOCABLE TRUST, Derivatively on Behalf of UNUM GROUP, <br><br> Plaintiff, <br><br> v. <br><br> RICHARD P. MCKENNEY, JOHN F. MCGARRY, DANIEL J. WAXENBERG, STEVE ZABEL, KEVIN T. KABAT, E. MICHAEL CAULFIELD, GLORIA C. LARSON, TIMOTHY F. KEANEY, THEODORE H. BUNTING, JR., CYNTHIA L. EGAN, RONALD P. O'HANLEY, FRANCIS J. SHAMMO, JOSEPH J. ECHEVARRIA, THOMAS R. WATJEN, PAMELA H. GODWIN, and EDWARD J. MUHL, <br><br> Defendants, <br><br> -and- <br><br> UNUM GROUP, a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

### VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Plaintiff, by its attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Unum Group ("Unum" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.   These wrongs resulted in billions of dollars in damages to Unum's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Unum to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Unum provides insurance policies and services and other financial protection services in the United States and United Kingdom, offering a portfolio that includes disability, life, accident, critical illness, cancer, dental, and vision coverage.   The Company's businesses operate within five segments, including Unum U.S., Unum U.K., Colonial Life, Corporate, and Closed Block.

3.      Unum's Closed Block segment provides more than a million customers with individual disability, long-term care for groups and individuals, and other insurance coverage products.   While Unum no longer actively markets or sells these products, the Company still has obligations to provide lifetime benefits and inflation coverage.    These policies pay for policyholders' nursing homes, assisted living facilities, and in-home healthcare aides, among other things.

4.      Unum receives a significant portion of its income from its Closed Block segment, generating at least 13% of its premium income, or over $1 billion in both 2016 and 2017.  Closed Block also contributed over $2.5 billion, or approximately 23%, to the Company's overall operating revenue.  Unum also allocates more than 30% of its capital to the segment's products.

5.     U.S. Generally Accepted Accounting Principles ("GAAP") and SEC rules governing corporate disclosures require companies that insure long-term care policies to collect and review claims experience and industry-wide trends in the long-term care market to allocate sufficient cash reserves to pay out anticipated claims.  Specifically, to account for these trends in updating cash reserves, long-term care insurers like Unum are required to regularly review certain factors, including mortality, lapse rates, claims experience, and health care costs.

6.     A crucial indicator of Unum's long-term care insurance performance is its interest adjusted loss ratio.  In the insurance industry, the loss ratio measures losses from claims and benefits paid out compared to premium income the company receives from policies.  Simply put, a higher loss ratio indicates that policies are less profitable or created greater losses in relation to earned premiums.  Further, higher interest adjusted loss ratios indicate that a company must take a statutorily-required reserve charge or increase the amount of reserves.

7.     Since at least October 2016, the Individual Defendants (as defined herein) repeatedly touted low interest adjusted loss ratios between 85% to 90% for its Closed Block long-term care policies.  In particular, the Individual Defendants caused or allowed the Company to report that it had in place an "extremely conservative" reserve plan designs that would keep loss ratios low or "relatively flat over the long term."  By making these claims, the Individual Defendants assured its customers and the investing public that the Company would not incur excessive losses and did not need to take a reserve charge.  Instead, Unum's fiduciaries routinely concealed the Company's true exposure from its long-term care business.

8.     The Individual Defendants made these assurances despite knowledge of, or at least reckless disregard for, obvious red flags in the long-term care insurance industry indicating that the Company needed to change its actuarial assumptions.  In particular, the long-term care

insurance market faced ultralow interest rates, higher life expectancy, and rising medical costs that offset higher premiums.  Unum faced an influx of costs associated with paying customers' claims and benefits due to these trends.  Other long-term care insurers took substantial and systematic charges after they adjusted actuarial assumptions to conform to the realities of the market.  Further, in 2011 and 2014, Unum had its own experience taking reserve charges under similar environmental circumstances.

9.      Yet, the Individual Defendants improperly delayed updating the Company's actuarial assumptions for their long-term care policies, thus avoiding the need to take hundreds of millions of dollars of statutorily-mandated reserve charges.  At a minimum, the Company's failure to adequately update the assumptions and modeling underlying its long-term care portfolio and materially increase the Company's reserves violated GAAP and other statutory accounting principles.

10.      In addition, the Individual Defendants failed to disclose to investors and the general public the Company's woefully inadequate internal controls over financial reporting with respect to its Closed Block segment.  As detailed herein, Unum's Board of Directors (the "Board") remained consciously inactive despite actual and/or constructive knowledge of wrongdoing at Unum when it ignored or recklessly disregarded red flags indicating severely deficient internal controls and failed to implement any meaningful changes to identify and immediately end the improper practices.  Based on the nature and scope of the breaches of duty, the members of the Board either knew of, or recklessly turned deaf ears and blind eyes to the misstatements and misconduct occurring around them, thereby ignoring the lack of sufficient internal protocols.

11.     On May 1, 2018, in contradiction to the Individual Defendants' prior assurances, Unum announced in a press release that the first quarter 2018 loss ratio for its long-term care business exceeded 96%.  The announcement stood in stark contrast to the 88.6% loss ratio the Company reported in the same quarter 2017.  In a subsequent conference call with analysts and investors, defendant John F. McGarry ("McGarry"), Unum's Chief Financial Officer ("CFO"), affirmed that volatility within the long-term care business would "continue in the future."  The Company admitted that it needed to increase its long-term care GAAP reserves by *$750 million* before-tax.

12.     In addition, defendants Richard P. McKenney ("McKenney"), Theodore H. Bunting, Jr. ("Bunting"), E. Michael Caulfield ("Caulfield"), Joseph J. Echevarria ("Echevarria"), Cynthia L. Egan ("Egan"), Pamela H. Godwin ("Godwin"), Kevin T. Kabat ("Kabat"), Timothy F. Keaney ("Keaney"), Gloria C. Larson ("Larson"), Edward J. Muhl ("Muhl"), Ronald P. O'Hanley ("O'Hanley"), Francis J. Shammo ("Shammo"), and Thomas R. Watjen ("Watjen") negligently made false and misleading statements in the Company's Proxy Statement on Form DEF 14A filed with the SEC on April 13, 2017 (the "2017 Proxy").  The 2017 Proxy was filed ahead of the Company's Annual Meeting of Shareholders for 2017.  The 2017 Proxy included votes on the election of Unum's Board, including defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo, as well as a stockholder vote for approval of the Company's Stock Incentive Plan of 2017.  In connection with seeking stockholder votes in accord with the Board's recommendations, the above members of the Board misleadingly stated that they engaged in operational risk oversight and the Audit Committee and Risk and Finance Committee exercises oversight of the Company's financial statements.  Through these statements, the above defendants misleadingly claimed that the

Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to identify and address wrongdoing; (ii) was well-informed of the Company's financial condition through myriad information channels; and (iii) promoted prudent risk management practices.  In reality, the Board, Audit Committee, and Risk and Finance Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.  As a result of these misleading statements, stockholders voted in accord with the Board's recommendations to reelect the above Board members and approve the proposed stock incentive plan.

13.     The Individual Defendants' actions have devastated Unum, as is evident from the 18% stock drop which wiped out almost *$2 billion* of the Company's market capitalization by May 3, 2018.  Defendants, however, did not fare as poorly as the Company.  Certain of the Individual Defendants have unlawfully reaped over $2.4 million in illegal insider trading proceeds of Company stock.  In addition, during this time, certain Individual Defendants collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Unum's actual performance while under their stewardship.

14.     Moreover, as a direct result of this unlawful course of conduct, Unum is now the subject of several federal securities class action lawsuits filed in the U.S. District Court for the Eastern District of Tennessee.  The class actions have been filed on behalf of investors who purchased Unum's shares against the Company and certain Individual Defendants alleging violations of federal securities laws in connection with certain false statements concerning the Company's business and operations.

15.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

JURISDICTION AND VENUE

16.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

17.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court in accordance with section 27 of the Exchange Act and 28 U.S.C. §1331.  Unum is incorporated in this District.  As state courts of Delaware lack subject matter jurisdiction in this case, given the exclusive jurisdiction vested in the federal courts over the federal claims asserted herein, then the sole and exclusive forum for certain legal actions involving the Company, including those for breach of fiduciary duty, shall be the U.S. District Court for the District of Delaware.

**THE PARTIES**

**Plaintiff**

19.     Plaintiff Vladimir Gusinsky Revocable Trust was a stockholder of Unum at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Unum stockholder.

**Nominal Defendant**

20.     Nominal defendant Unum is a Delaware corporation with principal executive offices located at 1 Fountain Square, Chattanooga, Tennessee.   Unum is a leading provider of financial protection benefits in the United States and the United Kingdom. The Company's products include disability, life, accident, critical illness, dental and vision insurance. As of December 31, 2017, Unum had approximately 9,400 full-time employees.

**Defendants**

21.     Defendant McKenney is Unum's Chief Executive Officer ("CEO") and has been since May 2015; and President and a director and has been since April 2015.   Defendant McKenney was also Unum's CFO from August 2009 to April 2015; and Executive Vice President from July 2009 to April 2015.   Defendant McKenney is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.   Defendant McKenney knowingly, recklessly, or with gross negligence: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.   Defendant McKenney also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy. Unum paid defendant McKenney the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2017 | $1,000,000 | $5,720,021 | $2,415,000 | $119,000 | $429,925 | $9,683,946 |
| 2016 | $994,231 | $5,176,835 | $2,100,937 | $84,000 | $315,316 | $8,671,319 |

22.     Defendant McGarry is Unum's Executive Vice President and CFO and has been since April 2015.  Defendant McGarry was also Unum's Executive Vice President, President, and CEO, Closed Block Operations from August 2013 to April 2015; Executive Vice President, Individual Disability and Long-term Care, Closed Block Operations from September 2012 to August 2013; Executive Vice President, President, and CEO, Unum U.K. from July 2010 to September 2012; Senior Vice President, Benefits, Individual Disability, and National Client Group Business, Unum U.S. from January 2010 to July 2010; Senior Vice President, Benefits Operations and Risk Management from March 2008 to January 2010; Senior Vice President, Benefits Operations from January 2006 to March 2008; Senior Vice President, Underwriting Operations from August 2005 to January 2006; and originally joined a Unum predecessor company in 1986 and served in various positions of increasing responsibility from 1986 to August 2005.  Defendant McGarry is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant McGarry knowingly, recklessly, or with gross negligence: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  While in possession of material, nonpublic information concerning Unum's true business health, defendant McGarry sold 28,983 shares of his stock for $1,195,960.62 in proceeds.  Unum paid defendant McGarry the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2017 | $623,077 | $1,040,004 | $822,462 | $322,000 | $231,242 | $3,038,785 |
| 2016 | $588,461 | $912,245 | $744,404 | $273,000 | $196,724 | $2,714,834 |

23.     Defendant Daniel J. Waxenberg ("Waxenberg") is Unum's Senior Vice President and Chief Accounting Officer and has been since February 2017.  Defendant Waxenberg was also Unum's Vice President, Global Financial Planning and Analysis from July 2012 to February 2017; Financial Controller, Unum U.K. from August 2008 to July 2012; Assistant Vice President, Internal Controls from May 2004 to July 2008; and a Financial Consultant at Unum from April 2002 to May 2004.  Defendant Waxenberg is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Waxenberg knowingly, recklessly, or with gross negligence: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; and (iii) failed to appropriately address the Company's inadequate internal controls.

24.     Defendant Steve Zabel ("Zabel") is Unum's President, Closed Block Operations and has been since July 2015.  Defendant Zabel was also Unum's Senior Vice President and Chief Risk Officer from August 2013 to July 2015.  Defendant Zabel is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Zabel knowingly, recklessly, or with gross negligence: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; and (iii) failed to appropriately address the Company's inadequate internal controls.

25.     Defendant Kabat is Unum's Chairman of the Board and has been since May 2017; Lead Independent Director and has been since May 2016; and a director and has been since June 2008.  Defendant Kabat knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to

adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business. Defendant Kabat also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy.  Unum paid defendant Kabat the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $260,647 | $150,002 | $410,649 |
| 2016 | $157,445 | $149,985 | $307,430 |

26.     Defendant Caulfield is a Unum director and has been since January 2007 and was previously a director from August 2004 to July 2005.  Defendant Caulfield is also Chairman of Unum's Audit Committee and a member of the Risk and Finance Committee has been since at least April 2015.  Defendant Caulfield knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant Caulfield also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy. While in possession of material, nonpublic information concerning Unum's true business health, defendant Caulfield sold 3,814 shares of his stock for $199,921.49 in proceeds.  Unum paid defendant Caulfield  the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $132,500 | $150,002 | $10,000 | $292,502 |
| 2016 | $132,500 | $149,985 | - | $282,485 |

27.     Defendant Larson is a Unum director and has been since November 2004. Defendant Larson knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business. Defendant Larson also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy.   While in possession of material, nonpublic information concerning Unum's true business health, defendant Larson sold 9,026 shares of her stock for $431,260.38 in proceeds.  Unum paid defendant Larson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $119,992 | $150,002 | $10,000 | $279,994 |
| 2016 | $120,000 | $149,985 | - | $269,985 |

28.     Defendant Keaney is a Unum director and has been since August 2012. Defendant Keaney is also a member of Unum's Audit Committee and has been since August 2012; and Chairman of the Risk and Finance Committee and has been since at least April 2015 and a member of that committee and has been since August 2012.  Defendant Keaney knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant Keaney also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading

statements in the 2017 Proxy.  Unum paid defendant Keaney the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $120,000 | $150,002 | $270,002 |
| 2016 | $120,000 | $149,985 | $269,985 |

29.     Defendant Bunting is a Unum director and has been since November 2013. Defendant Bunting was a member of Unum's Audit Committee from November 2013 to at least April 2018.  Defendant Bunting knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant Bunting also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy.  Unum paid defendant Bunting the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $110,000 | $150,002 | - | $260,002 |
| 2016 | $110,000 | $149,985 | $10,000 | $269,985 |

30.     Defendant Egan is a Unum director and has been since July 2014.  Defendant Egan knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant Egan also negligently violated section 14(a) of the Exchange Act by causing Unum to make

misleading statements in the 2017 Proxy.   Unum paid defendant Egan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $123,354 | $150,002 | $10,000 | $283,356 |
| 2016 | $110,000 | $149,985 | $10,000 | $269,985 |

31.   Defendant O'Hanley is a Unum director and has been since February 2015. Defendant O' Hanley was a member of Unum's Risk and Finance Committee from February 2015 to at least April 2018.  Defendant O'Hanley knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant O'Hanley also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy. Unum paid defendant O'Hanley the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $109,959 | $150,002 | $10,000 | $269,961 |
| 2016 | $110,000 | $149,985 | - | $259,985 |

32.   Defendant Shammo is a Unum director and has been since July 2015.  Defendant Shammo is also a member of Unum's Audit Committee and has been since July 2015.  Defendant Shammo knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant

Shammo also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy. Unum paid defendant Shammo the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $110,000 | $150,002 | $260,002 |
| 2016 | $110,000 | $149,985 | $259,985 |

33. Defendant Echevarria is a Unum director and has been since April 2016. Defendant Echevarria is also a member of Unum's Risk and Finance Committee and has been since May 2017; and was a member of the Audit Committee from April 2016 to May 2017. Defendant Echevarria knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business. Defendant Echevarria also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy. Unum paid defendant Echevarria the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $109,959 | $150,002 | $259,961 |
| 2016 | $124,540 | $171,467 | $296,007 |

34. Defendant Watjen was Unum's Chairman of the Board from May 2015 to May 2017; a director from May 2002 to May 2017; CEO from March 2003 to May 2015; President from March 2003 to April 2015; Vice Chairman and Chief Operating Officer from May 2002 to March 2003; Executive Vice President, Finance from June 1999 to May 2002; and Executive Vice President and CFO of a Unum predecessor company from July 1994 to June 1999.

Defendant Watjen knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business. Defendant Watjen also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy.   Unum paid defendant Watjen the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $80,000 | - | $5,000 | $85,000 |
| 2016 | $310,000 | $149,985 | - | $459,985 |

35.     Defendant Godwin was a Unum director from November 2004 to May 2018. Defendant Godwin was also a member of Unum's Risk and Finance Committee from at least December 2011 to May 2017.  Defendant Godwin knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant Godwin also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy.  While in possession of material, nonpublic information concerning Unum's true business health, defendant Godwin sold 12,500 shares of her stock for $595,370 in proceeds.  Unum paid defendant Godwin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | $120,000 | $150,002 | - | $270,002 |
| 2016 | $120,000 | $149,985 | $4,100 | $274,085 |

36.     Defendant Muhl was a Unum director from July 2005 to May 2017. Defendant Muhl knowingly or recklessly: (i) failed to allocate sufficient reserves for industry-wide downward trends in violation of GAAP and SEC regulations; (ii) failed to adequately adjust the Company's long-term care insurance actuarial assumptions; (iii) failed to appropriately address the Company's inadequate internal controls; and (iv) made improper statements in the Company's press releases and public filings concerning the Company's long-term care business.  Defendant Muhl also negligently violated section 14(a) of the Exchange Act by causing Unum to make misleading statements in the 2017 Proxy.   Unum paid defendant Muhl the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2017 | - | - | $5,000 | $5,000 |
| 2016 | $110,000 | $149,985 | - | $259,985 |

37.     The defendants identified in ¶¶21-24 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶21, 25-36 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶26, 28-29, 32-33 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶26, 28, 31, 33, 35 are referred to herein as the "Risk and Finance Committee Defendants."  The defendants identified in ¶¶22, 26-27, 35 are referred to herein as the "Insider Selling Defendants."  Collectively, the defendants identified in ¶¶21-36 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

Fiduciary Duties

38.     By reason of their positions as officers, directors, and/or fiduciaries of Unum, and because of their ability to control the business and corporate affairs of Unum, each of the Individual Defendants owed and owe Unum and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Unum in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Unum and its stockholders and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Unum and its stockholders the fiduciary to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Unum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Unum, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company.

40.     To discharge their duties, the officers and directors of Unum were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Unum.  By virtue of such duties, the officers and directors of Unum were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)      ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(c)      ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(d)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)      remain informed as to how Unum conducted its operations, and, upon receipt of notice of information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(f)      properly and accurately guide the Company's stockholders and the public when speaking about Unum's financial condition and operations at any given time.

**Additional Duties of the Audit Committee Defendants**

41.      In addition to these duties, the Audit Committee Defendants, defendants Bunting, Caulfield, Echevarria, Keaney, and Shammo, owed specific duties to Unum to assist the Board in overseeing the "integrity of the financial statements of the Company," "the compliance by the Company with legal and regulatory requirements," and "financial risk."  Particularly, according to the Audit Committee Charter, the Audit Committee is further charged with reviewing and discussing with management:

> [A]ccounting policies and significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles or financial statement presentation, any major issues as to the adequacy of the Company's internal control over financial reporting and any special steps adopted in light of significant deficiencies or material weaknesses identified in internal control over financial reporting.

The Audit Committee must further discuss with management "the Company's earnings press releases, including the use of 'pro forma' or 'adjusted' non-GAAP information, as well as the approach to be taken regarding the provision of financial information and earnings guidance to analysts and rating agencies."

**Additional Duties of the Risk and Finance Committee Defendants**

42.     Pursuant to the Board's Risk and Finance Committee Charter in effect at the time, the Risk and Finance Committee Defendants, defendants Caulfield, Echevarria, Godwin, Keaney, and O'Hanley, owed specific duties to Unum.  In particular, these defendants were required to oversee "the Company's enterprise risk management activities and any other risks the oversight of which is not allocated to another committee of the Board."  The Risk and Finance Committee is charged with monitoring, evaluating, and making:

> [R]ecommendations to the Board regarding matters pertaining to the Company's closed block segment, including the long-term care business, to the extent the Committee reasonably believes such matters could or will have a meaningful impact upon any of the investment, capital or financing plans, activities or associated risks for which the Committee has oversight responsibility under this Charter.

The Risk and Finance Committee is additionally required to:

> Review and discuss with management, including the Chief Risk Officer, the Company's policies and major exposures with respect to credit, market, liquidity and other risks associated with the Company's investment, capital and financing plans or activities for which the Committee has oversight responsibility and the steps management has taken to monitor and control such exposures.

Moreover, the Risk and Finance Committee must "[r]eview and discuss with management, including the Chief Risk Officer, the Company's risk assessment and risk management framework, including its risk management guidelines, risk appetite, key risk policies and control processes, and other enterprise risk management activities for which the Committee has oversight responsibility."

Breaches **of Duties**

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Unum, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Unum's Board during the time of the misconduct.

44.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, Unum to misrepresent its business, operational, and compliance policies, including with respect to the risks associated with Unum's reinsurance business.  The Individual Defendants further failed to implement proper internal controls to ensure meaningful adjustments were made to its interest adjusted loss ratio

assumptions and to ensure the Company maintained adequate reserves in accordance with GAAP.

45.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Unum, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage Unum has already incurred, Unum has expended, and will continue to expend, significant sums of money.

## **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Unum, regarding the Individual Defendants' management of Unum's operations and the Company's financial performance; (ii) facilitate the Insider Selling Defendants' illicit sales of over $2.4 million of their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Unum and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course

of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

48.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused Unum to issue improper financial statements.

49.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breaches of fiduciary duty, aiding and abetting, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning Unum's operations, financial condition, and future business prospects.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Unum to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

<u>SUBSTANTIVE ALLEGATIONS</u>

**Background of the Company**

52.     Unum is a global insurance provider offering primarily disability, accident, critical illness, and life insurance products.   The Company divides its operations into five segments: Unum U.S., Unum U.K., Colonial Life, Corporate, and Closed Block.

53.     Unum's Closed Block segment consists primarily of individual disability, group and individual long-term care, and other insurance products that the Company does not actively market.  Closed Block segment premium income for 2017 was comprised of approximately 42% individual disability and 58% group and individual long-term care.   The Company previously marketed two categories of long-term care products, including group long-term care offered to employers for the benefit of employees and individual long-term care offered on a single-life customer basis.

54.     The Closed Block segment provided significant premium income and operating revenue to the Company during the relevant period.  In 2016 and 2017, Closed Block contributed $1.2 billion and $1.1 billion, respectively, in premium income, and $2.6 billion and $2.5 billion, respectively, in operating revenue.   Compared to Unum's other business segments, the Closed Block segment provided 13% of the Company's premium income and 23% of the Company's operating revenue.

55.     Generally, long-term care insurance pays a benefit upon the loss of two or more activities of daily living or cognitive impairment requiring nursing home or in-home assistance. Payment is generally made on an indemnity basis, regardless of expenses incurred, up to a lifetime maximum.  Benefits begin after a waiting period, usually ninety days or less, and are generally paid for a period of three years, six years, or lifetime.

56.     In the insurance industry, long-term care policies are intended to help defray the cost of home care, assisted living care, nursing home care, and other specialized skilled facility care required when an individual needs assistance with daily living due to an accident, illness, cognitive impairment, or advancing age.   These costs are generally not covered by standard health insurance, Medicare, or Medicaid.

57.     Insurance companies like Unum began marketing and selling long-term care insurance in the 1970s.  Sales of long-term care policies peaked in 2002, when 102 insurance companies collectively sold 755,000 policies.   By 2009, most of these companies, including Unum in part, had exited the long-term care market.

58.     Under the long-term care policies, Unum collects premiums to insure costs associated with assisted living and other related expenses not covered by traditional insurance. To pay current and future claims on these policies, Unum is required to hold cash in reserves.

59.     Insurers like Unum use loss ratios as a metric to assess risks associated with their long-term care policies, including the need to increase reserves.  Unum assesses loss ratios by calculating the amount of losses from the payment of claims and benefits distributed over the premium income earned on its policies.  Thus, a higher ratio indicates an increase in the pay-out on claims and benefits, lower earned premiums, lower profitability of the policies, among other things.  The higher the loss ratio, the greater the need the Company must take a statutorily-mandated reserve charge or increase the cash in its reserves to pay out future claims.

**GAAP and SEC Requirements**

60.     In particular, GAAP and SEC regulations governing corporate disclosures require insurers like Unum to maintain adequate cash reserves and timely book related liabilities for anticipated claims.  GAAP are a common set of accounting principles, standards, and procedures

that companies must follow when they compile their financial statements.   GAAP are a combination of authoritative standards (set by policy boards) and the commonly accepted ways of recording and reporting accounting information.   The purpose of GAAP is to improve the clarity of communication of financial information.

61.     Unum is subject to SEC Regulation S-X.   Regulation S-X states that annual and interim financial statements filed with the SEC must be prepared in accordance with GAAP or they will be presumed to be misleading and inaccurate, even if a company provides accompanying disclosures with the non-GAAP financial statements.   In addition, SEC Rule 12b-20, 17 C.F.R. §240.12b-20, requires that periodic reports contain such information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

62.     Unum must comply with SEC regulations regarding financial statements, even if they are not specified under GAAP.   Of particular relevance in this matter, SEC Regulation S-K, Item 303, 17 C.F.R. §229.303 requires registrants to include management's discussion and analysis in all interim period financial statements, "so as to enable the reader to assess material changes in financial condition and results of operations" for the most recent quarter and year-to-date periods for both the current and prior year.   SEC Regulation S-K, Item 303(a), requires that Unum:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.   If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

63.     The Instructions to SEC Regulation S-K, Item 303, state that company financial statements "shall focus specifically on material events and uncertainties known to management

that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." SEC Release No. 33-6835, "SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations," states that disclosure is required for "known uncertaint[ies] reasonably likely to have material future effects on [the company's] financial condition."

64.     SEC Release No. 33-8040, "Cautionary Advice Regarding Disclosure About Critical Accounting Policies," instructs registrants to comply with Regulation S-K, Item 303(a), "Management's Discussion and Analysis of Financial Condition and Results of Operations." When estimates are susceptible to material change, the company must discuss not just the possibility that its estimates may turn out differently, but also: (i) the factors that may cause different outcomes; and (ii) the potential amount of variability in its significant estimates: "Companies should provide quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors." SEC Release No. 33-8350, "Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations."

65.     In addition to the GAAP and SEC requirements mandating disclosure of material issues with the Company's financial condition, the Company must specifically set appropriate cash reserves for anticipated insurance claims.  To account for trends affecting cash reserves, long-term care insurers are required to regularly review certain factors, including: mortality, morbidity, lapse rates, claims experience, and health care costs.  In addition, Unum's quarterly and annual reporting with the SEC must include disclosures about its long-term care insurance policy-based liabilities.  The Company's reporting must take into account claims paid in the same

accounting period, as well as expectations concerning events and circumstances creating liability and the eventual payment of future claims.

66.   GAAP applicable to accounting for long-term care obligations is set forth in Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 944.[1]   According to GAAP, long-term care insurers must perform premium deficiency testing when actual experience differs from the originally expected experience for each primary assumption.   According to paragraph 9.88 of the Audit and Accounting Guide ("AAG"), Life and Health Insurance Entities of the American Institute of CPAs:

> Overall consideration should be given to circumstances indicating that actual experience for a block of business, regardless of the issue year, is significantly different from the originally expected experience for each primary assumption.   In circumstances in which actual experience is significantly worse than the originally assumed experience, loss recognition testing is required, using revised assumptions that reflect actual experience and revised estimates of future experience, when appropriate.   Significant assumptions generally include mortality, morbidity, persistency, expense levels, and interest rates.

67.   When a deficiency is identified, GAAP requires the liability for future policy benefits to be determined using assumptions revised to consider then current experience.   In addition to an insurer's own experience, GAAP instructs insurers to look at available industry data to develop appropriate long-term care reserve assumptions.   Paragraph 7.50 of the AAG states:

> For accident and health contracts, assumptions may be based on the life insurance entity's own claims experience, or, if its own experience is unavailable or insufficient, *an appropriate basis for claims cost assumptions is industry experience adjusted for the expected experience for a specific coverage*, and the effect of the entity's underwriting practices.   *External trend factors, such as economic conditions and medical developments, should also be considered* as

---

[1] The SEC has delegated its authority to promulgate GAAP for public companies to the FASB. The FASB's standards are generally contained with the ASC.

they may create higher rates of morbidity by contract duration than are provided in the statutory or industry experience tables.

**The Board Fails to Address Market Risks and Realities Affecting Long-Term Care Policies**

68.     The appropriate level of reserves is based on a number of factors including mortality, morbidity, lapse rates, claims experience, and health care costs.  Companies within the long-term care insurance industry faced significant adverse conditions related to these factors affecting previously set prices.  These industry-wide, well-known adverse conditions resulted in a need to change assumptions about the factors.  Indeed, over the past several years, many long-term care insurers have revamped their actuarial assumptions and increased their insurance reserves to cover future claims.

69.     Unum was no exception.  The Company took reserve charges in its long-term care business in both 2011 and 2014.  The most recent reserve charge occurred in the fourth quarter of 2014 and totaled $453.8 million.  In 2014, the Company claimed that it reevaluated its actuarial assumptions underlying its reserve balance.  However, the Company failed to address the changing assumptions affecting the cost of providing long-term care insurance policies, namely higher claims incidence, less favorable policy terminations, miscalculated actuarial assumptions, premium price hikes that failed to offset increasing losses, and increased risk associated with losses.  Instead, the Company's fiduciaries, including then CFO defendant McKenney, associated the reserve charge primarily to low interest rates and tightening credit spreads.

70.     Other companies in the industry experienced similar reverse issues and took significant reserves.  For example, CNA Financial Corp. ("CNA") posted a $70 million fourth quarter 2015 net loss.  CNA attributed the loss to a $296 million reserve charge in its long-term care unit, pointing primarily to increased morbidity frequency.

71.     Similarly, Manulife Financial Corp. ("Manulife") reviewed its actuarial reserve assumptions for its long-term care business in year 2016.  Manulife's review of mortality, morbidity, and lapse experience resulted in an increase in insurance and investment contract liabilities of $655 million and a decrease in net income of $453 million.  The company noted its ratio of actual to expected claims surged to 116%, indicating an increase in claims and reduction in lapse and mortality rates.

72.     Further, General Electric Company's ("GE") business segment, GE Capital, took a $6.2 billion after-tax GAAP reserve charge for the fourth quarter of 2017 on GE Capital's legacy reinsurance contracts.  Moreover, GE revealed in January 2018 that it was required to make statutory reserve contributions of $15 billion over the next seven years.  GE attributed this enormous reserve charge to significantly greater claims than originally anticipated in the long-term care industry at large.  GE became the subject of an SEC investigation into its revenue recognition, as well as its controls and process leading to the insurance reserve increase. Notably, GE lost *$183 billion* in market capitalization in the wake of this reserve charge.

73.     Discussions about adverse trends and conditions were also pervasive in the long-term care industry and were the topic of numerous articles in long-term care actuarial and industry publications, professional sessions, and official government reports.  In July 2013, for example, the U.S. Department of Health and Human Services ("HHS") published a study titled "Exiting the Market: Understanding the Factors Behind Carriers' Decision to Leave the Long-Term Care Insurance Market."  This study discussed deteriorating conditions in the long-term care market.  The HHS noted more than simply low interest rates as the cause of this deterioration, which Unum claimed prompted its reserve charge in 2014.  Instead, the long-term care industry was experiencing low voluntary lapse rates, improving mortality, worsening

morbidity, and increasing claims that the Company did not fully address at the time.  The study

stated:

> Since the late 1990s, ***all of these major determinants of premium and product profitability have been going in the wrong direction: interest rates are significantly lower than what was priced for, voluntary lapse rates are lower than for any other insurance product, morbidity is somewhat worse than expected and mortality is actually improving***.
>
> *   *   *
>
> While there has been variability in cumulative industry claims performance over the last decade, recent data suggests that performance is deteriorating.  Over the past three years, ***new incurred claims are 112% higher than what was expected***.

74.     Further, on February 16, 2015, in response to the frequent earnings charges

experienced by long-term care providers, Moody's Investors Service summarized the state of the

long-term care industry:

> LTC [long-term care] is a difficult product to price and has historically given trouble to those life insurance companies offering it.  Genworth is the largest LTC provider and is one of a number of insurers whose LTC product has come under pressure.  Earlier this month, Unum Group (Baa2 stable), which has no GAAP margins on its LTC business, took a $698 million pre-tax reserve charge related to its reserve on its legacy LTC block, and the charge would have been higher without the assumption of future rate increases.  ***American Financial Group, Inc. (Baa1 negative) and CNO Financial Group, Inc. (Ba2 positive) each reported deterioration on their LTC margins, and like other insurers, relied on rate increases to offset the decline.***

75.     As a result, many insurers were forced to seek regulatory approval for double-

digit premium increases.  Even then, the funds fell far short of the amounts needed to pay out

benefits.  MetLife Inc., Prudential Financial Inc., and CNA, for example, were all forced to

dramatically increase premiums to pay out future claims from their long-term care policies.

76.     Despite significant risk exposure associated with the Closed Block segment long-

term care policies, Unum failed to give investors any indication that its retained portfolios were

exposed to tremendous risk.  Particularly, the Individual Defendants repeatedly touted the

reliability and continuing profitability of Unum's Closed Block segment, pointing to projections of relatively low interest adjusted loss ratios during the relevant period.  Despite knowledge of, or at least reckless disregard for, the market risks and realities, Unum failed to reassess its long-term care actuarial assumptions and make meaningful adjustments to its insurance reserves and disclose this to the investing public in violation of GAAP and SEC regulations.

**The Board Violated GAAP and SEC Regulations by Failing to Adequately Update Reserves**

77.    The rules discussed above obliged Unum to assess its long-term care reserve assumptions taking into consideration its own experience as well as the overall industry's experience.  However, despite Unum's own experience, and its knowledge of mounting industry-wide negative trends in the long-term care market and substantial and systematic charges taken by other insurers between 2012 and 2016, Unum failed to perform an adequate reserve analysis until the second quarter of 2018.  In consideration of the known adverse claims experience, Unum was aware that it needed to perform comprehensive reviews of its long-term care reserve-setting assumptions significantly prior to the second quarter of 2018.  Had Unum updated these assumptions, it would have been forced to materially increase its long-term care reserves and restate its guidance for the Company's interest adjusted loss ratio.  Consequently, by waiting until 2018, Unum improperly delayed increasing its long-term care reserves in violation of ASC 944.

78.    In addition to the Company's obligation to perform deficiency testing and revise actuarial assumptions as necessary, Unum also had an obligation to disclose information concerning risks and uncertainties relevant to its accounting.  Specifically, ASC 275-10-50-1 requires long-term care insurers to provide information in its financial statements concerning the following topics: (i) the nature of its operations; (ii) the use of estimates in the preparation of

financial statements; (iii) certain significant estimates; and (iv) current vulnerability due to certain concentrations.  The latter two requirements are particularly relevant to Unum's long-term care reserves.  Pursuant to these rules, Unum was required to disclose the nature of the uncertainties surrounding the estimates the Company used in setting long-term care reserves as the uncertainties became known.

79.     Furthermore, due to the substantial risk and uncertainty associated with long-term care reserves, as evidenced in the industry as well as at Unum, SEC regulations required the Company to provide Management's Discussion & Analysis ("MD&A") disclosures regarding changes in material trends, events, or uncertainty.   SEC Interpretation Release No. 33-6835 provides:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operation is not reasonably likely to occur.

**The Individual Defendants Caused Unum to Make False and Misleading Statements in Public Announcements and SEC Filings**

80.     Beginning in late 2016, the Individual Defendants further caused or allowed Unum to continuously disclose in its SEC filings and public announcements that the Company would experience low interest adjusted loss ratios for the individual disability and long-term care lines of business within the Closed Block segment.  In truth, the Company experienced higher claims incidence, less favorable policy terminations, miscalculated actuarial assumptions,

premium price hikes that failed to offset increasing losses, and increased risk associated with losses, requiring major reserve charges.  By May 2018, the Company had to admit that it was not able to maintain its long-term care interest adjusted loss ratio in the 85% to 90% range, as the Individual Defendants had led investors to expect, and this volatility would "continue in the future."

81.     On October 26, 2016, Unum issued a press release discussing the Company's financial and operating results for the third quarter 2016.   In the press release, defendant McKenney, Unum's President and CEO, touted the third quarter results as "very strong" and that the Company "continued to grow the top line and deliver value to our customers, as evidenced by our steady customer retention trends."  Despite higher average size of new claims, less favorable mortality experience, and unfavorable large group case moving to an individual policy ported status affecting the Company's long-term care lines, Unum reported "interest adjusted loss ratio for the long-term care line of business was 93.8 percent in the third quarter of 2016 compared to 89.9 percent in the third quarter of 2015."

82.     On October 27, 2016, the Company held a conference call with analysts and investors to discuss the third quarter financial results.  During the conference call, defendant McGarry described supposedly mitigating circumstances for the relatively high interest adjusted loss ratio for the quarter.  Defendant McGarry attributed the elevated claims rate to a one-time event due to the termination of the Company's largest group case.  Absent this case termination, defendant McGarry claimed the Company's "long-term care loss ratio would have been in the 85% to 90% range, consistent with our long-term expectations."  Instead, defendant McGarry touted the Company's increased premiums and decreased benefits that allayed potential risk to the long-term care portfolio going forward, stating:

*I continue to be pleased with the progress we are experiencing on achieving rate increases* on our in-force long-term care business.  In addition to making good progress with state regulators and receiving several new rate increase approvals this quarter, we are continuing to see strong take-up of the landing spot option.  *The landing spot has the same positive impact on reserves as rate increases but also has the added benefit of derisking the portfolio.  Since future claims will be smaller under the landing spot, under the landing spot, the reserves will be somewhat less sensitive to future changes in reserve assumptions.*

83.     Responding to an analyst at the October 27, 2016 conference call, defendant McGarry reported that the Company's experience with the 2014 reserve reset made its plan designs "extremely conservative."  Assuring the analyst that the Company made "significant progress" in projecting reserve assumptions, defendant McGarry stated:

So let me talk to you about what some of those things have been.  In 2014 we reset reserve assumptions.  We placed those reserve assumptions on a best estimate basis using our current own experience, *and our experience since then has been consistent with those expectations*.

We also established – when we establish[ed] those reserves, we built in currently-filed rate increases using historical approval rates.  Less than a third of those rate increase assumptions remain outstanding.  *We are making significant progress against them and feel very good about where the assumptions lie with only a small portion remaining*.

That not only helps to support our reserve assumptions, but it also gives us room in the future to react to future adverse claims experience should it emerge.  The third point I'd make is that our block's unique in the long-term care business, as approximately half of the block is group long-term care with employer funding and *extremely conservative plan designs*.  And because of that group coverage and employer funding, most employees terminate their employer-funded coverage when they leave the employer.

84.     Also on October 27, 2016, Unum filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2016 (the "Q3 2016 Form 10-Q") with the SEC.  Defendants McKenney and McGarry signed the Q3 2016 Form 10-Q.  The Q3 2016 Form 10-Q misleadingly stated that the "interest adjusted loss ratios for the individual disability and long-term care lines of business *will be relatively flat over the long term*, but these product lines may continue to

experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures."   The Q3 2016 Form 10-Q claimed that the Company was "continuously monitor[ing] key indicators to assess our risks and attempt to adjust our business plans accordingly."

85.     The Q3 2016 Form 10-Q contained certifications pursuant to sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("SOX") that the Quarterly Report fully complied with Rules 13(a) and/or 15(d) of the Exchange Act.   Defendants McKenney and McGarry certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

86.     On December 15, 2016, the Company held its annual Investor Day, during which certain defendants discussed the Company's interest adjusted loss ratio.   In particular, regarding the Company's claimed interest adjusted loss ratio of 85% to 95% in long-term care, defendant Zabel stated that "when you look at the underlying results we feel pretty good about being within that range."   Defendant Zabel purported that the Company's 2014 loss reserve adequacy study provided the Company with liability assumptions affecting its expected loss ratio, stating:

> As Jack mentioned, *we've gone through our reserve adequacy study.   This year we feel really good about where we are at both from the liability assumptions whether it's incidence, mortality, duration of claim we feel pretty good all in about how that's going*.
>
> *   *   *
>
> If you bring that back and just think all in how we're doing, *we are really right on top of how we thought about the impact of our premium rate increases and our original reserve assumptions.   So we feel really good about the progress we have made there*.

87.     On February 1, 2017, Unum issued a press release discussing the Company's financial and operating results for the fourth quarter 2016. In the press release, defendant

McKenney touted the fourth quarter results as "very strong" and that the Company "deliver[ed] a combination of growth, disciplined execution, and return of capital to our shareholders."  Unum reported "interest adjusted loss ratio for the long-term care line of business was 89.1 percent in the fourth quarter of 2016 compared to 89.7 percent in the fourth quarter of 2015, due primarily to favorable mortality experience and the impact of persistency on active life reserves."

88.     The next day, on February 2, 2017, the Company held a conference call with analysts and investors to discuss the fourth quarter and full year 2016 financial results.  During the conference call, defendant McGarry discussed the supposedly favorable trends, including rate increases, which would keep the interest adjusted loss ratio low since the 2014 reserve reset. Defendant McGarry stated:

> The year-over-year improvement was driven primarily by favorable mortality experience and the impact of persistency on active life reserves.  ***I will point out that since the fourth quarter of 2014 reserve adjustment, the interest adjusted loss ratio has been 89.4% within the long-term ratio of 85% to 90% that we expect.  Adjusting for the impact of the large group case termination which impacted the loss ratio in the third quarter of 2016, this two-year cumulative loss ratio would be 88.1%.***
>
> ***I continue to be pleased with the progress we're making in the Closed Block, particularly in the long-term care line.  The yields achieved on new money for the long-term care business have consistently exceeded the assumptions we have built into our reserves.  Also, we continue to make good progress in achieving rate increases in our in-force long-term care business.***

89.     Defendant McGarry also claimed during the February 2, 2017 conference call that the Company was "meeting new money yield targets for … long-term care," among other things. These supposedly positive trends would "build and grow" Unum.  Defendant McGarry stated:

> We are executing very well on our strategies, with a focus on maintaining pricing discipline, generating strong persistency and growth in our core business segments, delivering on renewals to maintain our profit margins, and ***meeting new money yield targets for the long-term care. This success gives us a great foundation to continue to build and grow upon as we move into 2017***.

90.     On February 22, 2017, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") with the SEC.   Defendants McKenney, McGarry, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen signed the 2016 Form 10-K.   The 2016 Form 10-K misleadingly stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business *will be relatively flat over the long term*, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures."   Further, the 2016 Form 10-K purported that the Company was "continuously monitor[ing] key indicators to assess our risks and attempt to adjust our business plans accordingly," and that the Company's strategy for its Closed Block segment remained "substantially unchanged."

91.     The 2016 Form 10-K contained certifications pursuant to SOX that the Annual Report fully complied with Rules 13(a) and/or 15(d) of the Exchange Act.   Defendants McKenney and McGarry certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

92.     On April 26, 2017, Unum issued a press release discussing the Company's financial and operating results for the first quarter of 2017.   In the press release, defendant McKenney touted the first quarter results' "record earnings levels and overall consistent performance."   Unum reported "interest adjusted loss ratio for the long-term care line of business was 88.6 percent in the first quarter of 2017 compared to 88.9 percent in the first quarter of 2016, primarily driven by favorable mortality experience."

93.     The next day, on April 27, 2017, the Company held a conference call with analysts and investors to discuss the first quarter 2017 financial results.   During the conference call, defendant McGarry discussed the Company's long-term care business.   Defendant McGarry claimed the Company's loss ratio "remained generally in line with our assumptions since the end of 2014."   Defendant McGarry stated:

> …Importantly, the long-term care benefit ratio remains within our expected range of 85% to 90%.
>
> Overall, we continue to be pleased with the progress we're seeing in managing the long-term care block.   ***Our claims experience has remained generally in line with our assumptions since the end of 2014***, when we updated our reserve assumptions to reflect our current view of the business.   We are also making good progress on rate increase approvals on our in-force business.   This past quarter, we received several rate increase approvals.   And though they tended to be in smaller states, we are tracking very well relative to the rate increase assumptions we've factored into our reserves.   Our reserve assumptions only factored in rate increase requests related to our 2014 program.
>
> We also discounted our assumptions, but what we thought we would realistically receive from state insurance departments.   ***We have not factored in any benefit from rate increases that we expect to file for in the future***.   In addition, the landing spot continues to be viewed favorably by regulators and policyholders are favoring this option in their elections.

94.     Also on April 27, 2017, Unum filed its Quarterly Report on Form 10-Q for the third quarter ended March 31, 2017 (the "Q1 2017 Form 10-Q") with the SEC.   Defendants McGarry and Waxenberg signed the Q1 2017 Form 10-Q.   The Q1 2017 Form 10-Q misleadingly stated that the "[b]enefits experience in both our individual disability and long-term care lines of business ***remains within our range of expectations***."   The Q1 2017 Form 10-Q claimed that the Company's "interest adjusted loss ratios for the individual disability and long-term care lines of business will be relatively flat over the long term, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures."   The Company claimed that it "continuously

monitor[ed] key indicators to assess our risks and attempt to adjust our business plans accordingly."

95.     The Q1 2017 Form 10-Q contained certifications pursuant to SOX that the Quarterly Report fully complied with Rules 13(a) and/or 15(d) of the Exchange Act.  Defendants McKenney and McGarry certified that the Quarterly Report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

96.     On July 27, 2017, Unum issued a press release discussing the Company's financial and operating results for the second quarter of 2017.  In the press release, defendant McKenney touted the reportedly "very strong" second quarter results "with a good balance of top line growth, solid earnings growth, and return of capital to shareholders."  "The disciplined execution of our strategy in serving our customers continues to drive strong and consistent operating trends, highlighted by good sales and premium growth, stable benefits experience, and well-managed expenses," he continued.  In the press release, Unum reported "interest adjusted loss ratio for the long-term care line of business was 89.4 percent in the second quarter of 2017 compared to 92.6 percent in the second quarter of 2016, primarily driven by lower claims incidence."

97.     The next day, on July 28, 2017, the Company held a conference call with analysts and investors to discuss the second quarter 2017 financial results.  Claiming that the long-term care line interest adjusted loss ratio was 89.4% compared to the 92.6% ratio from the year prior, defendant McGarry stated "[t]his improvement was driven primarily by lower claims incidence relative to last year's second quarter."  During the conference call, defendant McGarry also

declared that "[l]ooking at interest rates and new money yields for the long-term care portfolio, we continue to exceed our new money yield objective of 5% in the second quarter."

98.     Also on July 28, 2017, Unum filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q") with the SEC.  Defendants McGarry and Waxenberg signed the Q2 2017 Form 10-Q.  The Q2 2017 Form 10-Q misleadingly stated that the "[b]enefits experience in both our individual disability and long-term care lines of business *remains within our range of expectations*."  The Q2 2017 Form 10-Q claimed that the Company's "interest adjusted loss ratios for the individual disability and long-term care lines of business *will be relatively flat over the long term*, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures."  The Company claimed that it "continuously monitor[ed] key indicators to assess our risks and attempt to adjust our business plans accordingly."

99.     The Q2 2017 Form 10-Q contained certifications pursuant to SOX that the Quarterly Report fully complied with Rules 13(a) and/or 15(d) of the Exchange Act.  Defendants McKenney and McGarry certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

100.    On October 25, 2017, Unum issued a press release discussing the Company's financial and operating results for the third quarter of 2017.  In the press release, defendant McKenney touted the reportedly "very good" third quarter results "driven by solid top-line growth, overall stable benefits experience, and good expense management."  Unum reported

"interest adjusted loss ratio for the long-term care line of business was 93.3 percent in the third quarter of 2017 compared to 93.8 percent in the third quarter of 2016, due to the impact of a large group case moving to an individual policy ported status in 2016, partially offset by unfavorable policyholder lapses in the current quarter."

101.    The next day, on October 26, 2017, the Company held a conference call with analysts and investors to discuss the third quarter 2017 financial results.   During the conference call, defendant McGarry downplayed the increase in the long-term care interest adjusted loss ratio as within the Company's expectations and that Unum was still experiencing favorable trends in the long-term care line overall.  Defendant McGarry stated:

> The elevation in the current benefit ratio is largely attributable to unusually unfavorable policyholder lapses. Although we'd rather than not see this volatility, we're encouraged that *the underlying claims experience was consistent with historical norms*.
>
> *Other important factors related to long-term care – to the long-term care line continued to trend favorably this quarter*.  Our new-money yield in the quarter was again above our 5% assumption, just as it has been since resetting of that assumption in the fourth quarter of 2014.  In addition, we continue to make good progress with rate increases on the in-force business, with several additional approvals, *keeping us on pace to achieve, if not slightly exceed, the rate increase expectations assumed in our reserves*.  We continue to have productive discussions with our state insurance departments, and it's worth noting that other than the small amounts outstanding from our 2014 filings, no future rate increases are built into our current reserve assumptions.  With that said, we plan to actively pursue the future rate increases [where] justified.

102.    Also on October 26, 2017, Unum filed its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q") with the SEC.  Defendants McGarry and Waxenberg signed the Q3 2017 Form 10-Q.   The Q3 2017 Form 10-Q misleadingly stated that the "the interest adjusted loss ratios for the individual disability and long-term care lines of business *will be relatively flat over the long term*, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term

care product lines as our claim block matures."   The Q3 2017 Form 10-Q claimed that the Company "continuously monitor[ed] key indicators to assess our risks and attempt to adjust our business plans accordingly."

103.    The Q3 2017 Form 10-Q contained certifications pursuant SOX that the Quarterly Report fully complied with Rules 13(a) and/or 15(d) of the Exchange Act.   Defendants McKenney and McGarry certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

104.    On January 31, 2018, Unum issued a press release discussing the Company's financial and operating results for the fourth quarter of 2017.   In the press release, defendant McKenney touted the fourth quarter results as "strong, capping a very successful year for the company that surpassed our expectations."   Unum reported "interest adjusted loss ratio for the long-term care line of business was 93.1 percent in the fourth quarter of 2017 compared to 89.1 percent in the fourth quarter of 2016, primarily due to unfavorable policy terminations related to mortality experience."

105.    The next day, on February 1, 2018, the Company held a conference call with analysts and investors to discuss the fourth quarter and full year 2018 financial results.   During the conference call, defendant McGarry again downplayed the increase in the long-term care interest adjusted loss ratio as within the Company's expectations and expressed confidence that the Company's current reserve assumptions would not increase, particularly that the ratio would not exceed 95%.  Defendant McGarry stated:

> ***Two important factors related to the long-term care line continue to trend favorably this quarter***.  First, our new money yield this quarter was, again, above

our assumption of 5%, just as it has been since resetting that assumption in the fourth quarter 2014.  Again, as we said in December, we're nearing the point where our reserve assumptions begin to reflect our rising new money yields. While long duration treasury yields have moved somewhat higher recently, credit spreads on bonds remain tight.  Second, while it's a quiet quarter for rate increase approvals on inforce business, we still have a few large rate requests yet to be decided.  Even without these, we're confident we will achieve the rate increase expectations assumed in our reserve assumptions.  ***It bears repeating that we assume no future rate increases in our current reserve assumptions***, though we intend to actively pursue future rate increases where justified.

106.    Defendant McGarry also distinguished Unum's long-term care business from that of GE, which took a $9.5 billion pre-tax charge for its fourth quarter of 2017 and will take $15 billion over the next seven years.  Defendant McGarry emphasized the Company's aggressive management of its Closed Block segment and its 2014 reserve charge reset as reasons the Company would continue to keep its loss ratio low.  Defendant McGarry stated:

> …***[W]e feel like we are in a very different place than GE is***.  First, I'd point out that the blocks are very different.  GE's block was a reinsured block, which removes them one step from the customer.  Our block was direct written.  So we directly control the underwriting and benefit guidelines in that block.  The other big difference is 85% of our insured lives are group long-term care.  They have a much younger profile.  They – and most of those actual group long-term care insureds are employer-funded as opposed to employee-funded, much smaller benefit levels, much more conservative plan designs.  The other – by comparison, the GE block was 100% long-term care and was a much older block than our block is.  ***Second, we've aggressively and actively managed our block over time. Since – I know, we've had 10 full-time actuaries dedicated to the block since 2012 and for a period, I was one of them***.  Between reserve increases and reserve charges, we've strengthened reserve margins over time by $4 billion in the block, and I will tell you within long-term care, timing matters.  The earlier you move, the better off you're going to be.  And so we have been an early adopter in that in the block.  ***The third thing I'd say is, we did our comprehensive review of the long-term care block in 2014.  We provided a lot of resources to build sophisticated models.  We reset our assumptions to be consistent with our emerging experience.  And on an ongoing basis, monthly, we track our actual to assumed assumptions, and we provide you quarterly updates with that on an ongoing basis***.  The fourth thing I'd point out is we just concluded our 2017 reserve accuracy studies.  We had margin in our reserves, as a result of that analysis.  The other thing is we have no future rate increases assumed, although we intend to pursue them.  And then finally, we have a $1 billion difference between our GAAP reserves and stat reserves.  We believe these buffers insulate our capital plans.  We've been dealing with this problem for a long time.  I think

our dealing with it is characterized by there's been no surprises.  As a result, we've kept you apprised on an ongoing basis of where we are and there has been no impact to our capital plans along the way.  ***And we would expect that to continue into the future***.

107.    On February 21, 2018, the Company filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K") with the SEC.  Defendants McKenney, McGarry, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo signed the 2017 Form 10-K.  The 2017 Form 10-K misleadingly stated that "the interest adjusted loss ratios for the individual disability and long-term care lines of business ***will be relatively flat over the long term***, but these product lines may continue to experience quarterly volatility, particularly in the near term for our long-term care product lines as our claim block matures."  Further, the 2017 Form 10-K purported that "[f]or 2018, although premium rate increases and higher investment margins have contributed positively to the interest adjusted loss ratios for our long-term care product lines, ***we expect that they will remain in the low 90 percent range***."

108.    The 2017 Form 10-K contained certifications pursuant to SOX that the Annual Report fully complied with Rules 13(a) and/or 15(d) of the Exchange Act.  Defendants McKenney and McGarry certified that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

## THE FALSE AND MISLEADING 2017 PROXY

**The 2017 Proxy**

109.    On April 13, 2017, defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen caused Unum to file

with the SEC its 2017 Proxy in connection with the 2017 Annual Meeting of Shareholders, held on May 25, 2017.   Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen negligently issued materially misleading statements with respect to these solicited votes.   Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.   Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

### **Material Misstatements in Support of Reelecting Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo**

110.     In the 2017 Proxy, defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo solicited votes to reelect themselves. In support of their bid to reelect themselves, defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo highlighted their supposed successful oversight of the Company.   Additionally, the 2017 Proxy incorrectly claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on managing strategic risk; (ii) the Risk and Finance Committee exercised oversight over the Company's Closed Block segment; (iii) the Audit Committee exercised oversight of the financial statements; and (iv) Unum's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's Annual Report.

111.    In terms of the Board's oversight of risk, the 2017 Proxy stated on page 32:

**The Board's Role in Risk Oversight**

***The Board has an active role, as a whole and also at the committee level, in overseeing management of the company's risks.***   The Board is responsible for managing strategic risk, and it regularly reviews information regarding our capital, liquidity and operations, as well as the risks associated with each.   The Risk and Finance Committee is responsible for oversight of the company's enterprise risk management program and receives a report on these activities at least quarterly.   The Risk and Finance Committee is also responsible for overseeing risks associated with investments and related financial matters, including those pertaining to our Closed Block segment, and any other risks not specifically allocated to another committee for oversight.   The Audit Committee is responsible for oversight of financial risk and continues to fulfill its NYSE-mandated responsibility to discuss guidelines and policies with respect to the process by which the company undertakes risk assessment and risk management. The Audit Committee and Risk and Finance Committee may also meet jointly as appropriate to oversee certain risks for which they have overlapping responsibility, including operational risks relating to data privacy, cybersecurity and business continuity….   ***While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the entire Board of Directors is regularly informed through committee reports about such risks in addition to the risk information it receives directly.***

112.    Further, the 2017 Proxy claimed that the Risk and Finance Committee conducted

proper oversight of the risks associated with the Company's Closed Block segment.   The 2017

Proxy stated on page 30:

**Risk and Finance Committee**

The Risk and Finance Committee assists the Board in oversight of our investments, capital and financing plans and activities, including dividends and borrowings, and related financial matters and the associated risks. It also oversees our enterprise risk management activities and other risks not specifically allocated to another committee. Among other responsibilities, the Risk and Finance Committee:

- Monitors, evaluates and recommends to the Board capital and financing plans, activities, requirements and opportunities;

- Oversees implementation of and compliance with investment strategies, guidelines and policies;

- Authorizes loans and investments of the company;

- Reviews, assesses and reports on the impact of various finance activities on our debt ratings; and

- ***Monitors, evaluates and makes recommendations regarding matters pertaining to our Closed Block segment, including the long-term care business, that could have a meaningful impact upon any of the matters for which the Risk and Finance Committee has oversight responsibility.***

113.    The 2017 Proxy also claimed that the Audit Committee exercised oversight over the Company's financial statements and reporting process.  The 2017 Proxy stated on pages 36-37:

**Report of the Audit Committee**

\* \* \*

The Committee reviewed and discussed with management the company's audited financial statements for the year ended December 31, 2016, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant estimates and assumptions which could impact the amounts reported in the company's financial statements, and the clarity of disclosures in the financial statements. The Committee reviewed and discussed with the independent auditor the overall scope and results of the independent audit and its judgments of the quality and acceptability of the company's accounting principles. ***The Committee also engaged in discussions with management and the independent auditor, among other matters, concerning management's assessment of reserve adequacy across all major business lines, which is presented to the Committee each year.***

\* \* \*

The Committee reviewed and discussed with the company's internal auditors, and received regular status reports from them concerning, the overall scope and plans for their audits. ***The Committee met with the internal auditors, with and without management present, to discuss their audit observations and findings, and management's responses, and their evaluation of the effectiveness of the company's internal control over financial reporting.***

\* \* \*

Based on the reviews and discussions referred to above, the Committee recommended to the Board of Directors, and the Board approved, that the company's audited financial statements for the year ended December 31, 2016 be

included in the company's Annual Report on Form 10-K for filing with the Securities and Exchange Commission.

114.    Through these statements, defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen's statements misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  In reality, the Board, Risk and Finance Committee, and Audit Committee did not exercise active and appropriate oversight over the Company's corporate governance, risk management, and financial statements.  Rather, these Board members continually failed to address the Company's increasing interest adjusted loss ratio and need to take a reserve charge, and therefore its financial statements were not appropriate to include in the Company's SEC filings.  Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen were negligent in including these misleading statements in the 2017 Proxy.

115.    Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo made these material misrepresentations above in the 2017 Proxy in support of a stockholder vote for reelecting themselves to the Board.  Numerous stockholders voted in favor of their reelection based on material misrepresentations about the Company's supposed risk management and internal controls over its financial reporting.  This harmed stockholders by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  Therefore, the 2017 Proxy solicitation was an "essential link" in the accomplishment of the harm-causing conduct.

**Material Misstatements in Support of a Vote to Approve of the Stock Incentive Plan**

116.   Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen also made material misrepresentations in the 2017 Proxy in support of a stockholder vote for approval of the Company's Stock Incentive Plan of 2017 (the "Plan").  The Plan sought to add 12.3 million shares available for issuance under the Plan, diluting voting power by approximately 6.25% as of March 15, 2017.  The purpose of the Plan was supposedly "to allow the company to attract, retain and motivate officers, employees, directors and/or consultants and to provide the company with a long-term incentive plan providing incentives directly linked to shareholder value."  The annual and long-term compensation awards were subject to performance goals, which included low loss ratios, such as:

> [S]uch goals will be based on the attainment of objective, specified levels of one or more of the following measures: overall or selected premium or sales growth, expense efficiency ratios (ratio of expenses to premium income), market share, customer service measures or indices, underwriting efficiency and/or quality, persistency factors, return on net assets, economic value added (or an equivalent metric), shareholder value added, embedded value added, **combined ratio, expense ratio, loss ratio, premiums**, risk based capital, revenues, revenue growth, earnings (including earnings before taxes, earnings before interest and taxes or earnings before interest, taxes, depreciation and amortization), earnings per share, operating income (including non-pension operating income), pre- or after-tax income, net income, cash flow (before or after dividends), cash flow per share (before or after dividends), gross margin, return on equity, return on capital (including return on total capital or return on invested capital), cash flow return on investment, return on assets or operating assets, stock price appreciation, total stockholder return (measured in terms of stock price appreciation and dividend growth), cost control, gross profit, operating profit, cash generation, unit volume, stock price, market share, sales, asset quality, cost saving levels, marketing-spending efficiency, core non-interest income, or change in working capital with respect to the company or any one or more subsidiaries, divisions, business units or business segments of the company either in absolute terms or relative to the performance of one or more other companies or an index covering multiple companies.

117.    The material terms of the performance goals in Unum's Plan did not encourage proper risk oversight, nor advanced long-term stockholder value.  In reality, the material terms of the performance goals in the Plan actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices, which furthered only short-term growth fueled by the promise of lower average interest adjusted loss ratios during the relevant period.

118.    Particularly, the Plan incentivized Company fiduciaries to conceal the Company's increased risk of its interest adjusted loss ratio exceeding 95% and the need to take a reserve charge.  Defendants knew or should have known that executives had breached their fiduciary duties to the Company and exposed the Company to significant and material risks and liability through their conduct.

119.    Under this false impression, numerous Unum stockholders voted for the distribution of shares under the Plan.  This vote was made without the benefit of material information regarding the defendants' continued and ongoing failure to address higher claims incidence, less favorable policy terminations, miscalculated assumptions, and increasing losses that made unsustainable a loss ratio between 85% and 90%.  In reality, the Plan only incentivized the continued risk-taking, illegal, and loss-generating corporate action described herein.  The proxy solicitation for a stockholder vote on the material terms of the performance goals in Unum's Plan directly authorized harm to the stockholders.  Therefore, the 2017 Proxy was an "essential link" in the accomplishment of the harm-causing conduct.

## THE TRUTH EMERGES

120.    On May 1, 2018, Unum issued a press release discussing the Company's financial and operating results for the first quarter of 2018.  Despite the Individual Defendants' assertions otherwise, the Company's interest adjusted loss ratio for its long-term care business breached

95%, with the Company reporting **_96.6%_**.  This dramatic increase stood in opposition to the 88.6% loss ratio reported in the first quarter of 2017.  The stark change in loss ratio from what the Individual Defendants led investors and analysts to expect was primarily due to higher claims incidence.  The Company also pointed to the result of the 4.7% decrease in premium income compared to the first quarter of 2017 due to policy terminations and maturities for the individual disability line of business.  Further, premium income for long-term care decreased due to policy termination.

121.    The Company announced the next day, on May 2, 2018, that increased interest adjusted loss ratios would continue indefinitely.  In a May 2, 2018 conference call with analysts and investors to discuss these results, defendant McGarry admitted that the volatility leading to higher loss ratios in the long-term care business would "continue in the future."

122.    Analysts expressed alarm at the change to Unum's long-term care book, raising concerns about potential reserve charges.  For example, an Evercore ISI analyst, Thomas Gallagher, stated that the long-term interest-adjusted loss ratio "cast a shadow" and increased the chance that Unum will need to take a statutorily-mandated reserve charge.  Evercore thus downgraded Unum's stock to Underperform.  Similarly, J.P. Morgan analyst Jimmy Bhullar noted that the Company remains susceptible to reserve increases for the foreseeable future.  Bhullar stated that "[a]side from rates, UNM's LTC [long-term care] reserves are susceptible to deteriorating industry-wide claims trends due to increasing life expectancies and healthcare cost inflation."

123.    On this news, Unum's market capitalization plunged more than 18%, or $8.85 per share, on May 3, 2018, to close at $39.05 per share compared to May 1, 2018 trading day's closing of $47.90 per share.  The news erased almost **_$2 billion_** in market capitalization in less

than two days.  Unum's stock has yet to recover.

124.    Analysts' fears about reserve charges were warranted.  As a result of increasing loss ratios, Unum must take a significant reserve charge.  In particular, Unum revealed in a September 18, 2018 press release that "expects to increase its long-term care GAAP reserves in the third quarter of 2018 by approximately $590 million after-tax, or approximately *$750 million* before-tax."  In addition to this $750 million GAAP reserve charge, the Company admitted it will suffer a $200 million pre-tax statutory reserve impact covering both its active life and claim reserves for its long-term care business.

## INSIDER SALES BY DEFENDANTS MCGARRY, GODWIN, LARSON, AND CAULFIELD

125.    Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Unum's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Unum, defendants were privy to material, nonpublic information about the Company's true business health.

126.    While in possession of this knowledge, defendant McGarry sold 28,983 shares of his personally held Unum stock for proceeds of $1,195,960.62.  Defendant McGarry's sales were timed to maximize profit from Unum's then artificially inflated stock price.  Further, defendant McGarry's sales are suspicious given that his stock sales represented 21% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 77,444 |
| Shares Sold During SP | 28,983 |
| Shares Disposed (Other) During SP | 20,633 |
| Total Shares Held During SP | 133,406 |
| Shares Remaining SP | 83,790 |
| **Total Proceeds from Sales** | **$1,195,960.62** |
| **% of Total Ownership Sold During SP** | **21.73%** |

127.    While in possession of this knowledge, defendant Godwin sold 12,500 shares of her personally held Unum stock for proceeds of $595,370.  Defendant Godwin's sales were timed to maximize profit from Unum's then artificially inflated stock price.   Further, defendant Godwin's sales are suspicious given that her stock sales represented nearly 19% of her holdings as demonstrated by the table below:

| Total Shares Before Sales | 62,171 |
|---|---|
| Shares Sold During SP | 12,500 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 66,012 |
| Shares Remaining SP | 53,512 |
| **Total Proceeds from Sales** | **$595,370.00** |
| **% of Total Ownership Sold During SP** | **18.94%** |

128.    While in possession of this knowledge, defendant Larson sold 9,026 shares of her personally held Unum stock for proceeds of $431,260.38.  Defendant Larson's sales were timed to maximize profit from Unum's then artificially inflated stock price.  Further, defendant Larson's sales are suspicious given that her stock sales represented 11% of her holdings as demonstrated by the table below:

| Total Shares Before Sales | 73,711 |
|---|---|
| Shares Sold During SP | 9,026 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 80,899 |
| Shares Remaining SP | 71,873 |
| **Total Proceeds from Sales** | **$431,260.38** |
| **% of Total Ownership Sold During SP** | **11.16%** |

129.    While in possession of this knowledge, defendant Caulfield sold 3,814 shares of his personally held Unum stock for proceeds of $199,921.49.  Defendant Caulfield's sales were timed to maximize profit from Unum's then artificially inflated stock price.  Further, defendant Caulfield's sales are suspicious given that his stock sales represented nearly 8% of his holdings as demonstrated by the table below:

| | |
|---|---:|
| Total Shares Before Sales | 40,316 |
| Shares Sold During SP | 3,814 |
| Shares Disposed (Other) During SP | 5,347 |
| Total Shares Held During SP | 49,477 |
| Shares Remaining SP | 40,316 |
| **Total Proceeds from Sales** | **$199,921.49** |
| **% of Total Ownership Sold During SP** | **7.71%** |

130.    The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Unum's stock price.  Following the improper statements made during the relevant period, the Company's stock rose from a low of $36.19 per share in October 2016 to a high of $58.59 per share in January 2018, representing a 62% increase.  In sum, during the relevant period, the Insider Selling Defendants sold over $2.4 million worth of their personally held stock at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---:|---|---:|
| **MCGARRY** | 11/14/2016 | 12,000 | $41.44 | $497,280.00 |
| **Current Executive Vice President and Chief Financial Officer** | 11/15/2016 | 5,520 | $41.14 | $227,092.80 |
| | 11/15/2016 | 6,613 | $41.14 | $272,058.82 |
| | 11/15/2016 | 4,850 | $41.14 | $199,529.00 |
| | | 28,983 | Total Proceeds | $1,195,960.62 |
| | | | | |
| **GODWIN** | 2/6/2017 | 10,000 | $46.86 | $468,600.00 |
| **Former Director** | 8/7/2017 | 2,500 | $50.71 | $126,770.00 |
| | | 12,500 | Total Proceeds | $595,370.00 |
| | | | | |
| **LARSON** | 2/6/2017 | 6,566 | $46.86 | $307,694.58 |
| **Current Director** | 8/1/2017 | 2,460 | $50.23 | $123,565.80 |
| | | 9,026 | Total Proceeds | $431,260.38 |
| | | | | |
| **CAULFIELD** | 10/30/2017 | 3,814 | $52.42 | $199,921.49 |
| **Current Director** | | 3,814 | Total Proceeds | $199,921.49 |
| | | | | |
| | **TOTAL:** | **54,323** | | **$2,422,512.49** |

## REASONS THE STATEMENTS WERE IMPROPER

131.   The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)   the Company's long-term care business saw higher claims incidence;

(b)   the Company experienced less favorable policy terminations in its long-term care business;

(c)   the Company's assumptions about its long-term care business contained actuarial miscalculations;

(d)   the Company's strategy of hiking premiums to offset losses in its long-term care business was unsustainable;

(e)   the Company was unable to maintain an interest adjusted loss ratio between 85% to 90% as a result of increasing losses and the need to take major reserve charges;

(f)   the Company lacked effective internal controls over its financial reporting and disclosure controls and procedures; and

(g)   as a result of the foregoing, the Company improperly accounted for major reserve charges, and the officers' and directors' representations concerning the Company's business, prospects, and financial standing were improper.

## DAMAGES TO UNUM

132.   As a result of the Individual Defendants' improprieties, Unum disseminated improper, public statements concerning the Company's interest adjusted loss ratio, accounting for reserves, and the adequacy of the Company's internal controls over its financial reporting.  These

improper statements have devastated Unum's credibility as reflected by Unum's almost $2 billion, or 18%, market capitalization loss.

133.    Unum's improper accounting practices and gross failures to timely address, remedy, or even disclose such practices also severely damaged its reputation within the business community and in the capital markets.   In addition to price, Unum's customers and current and potential investors consider a company's trustworthiness, stability, and ability to evaluate known risks.   Businesses are less likely to award contracts to companies that knowingly permit unscrupulous behavior, and investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial conditions.   Accordingly, Unum's ability to attract customers and investors is now impaired.   In addition, Unum's ability to raise equity capital or debt on favorable terms in the future is now impaired.   The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

134.    Further, as a direct and proximate result of the Individual Defendants' actions, Unum has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

b)    costs incurred from the Company's internal reserve review and investigation into accounting issues;

      c)     costs incurred from the Company's internal investigation and review of insider sales; and

      d)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Unum.

<u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

135.    Plaintiff brings this action derivatively in the right and for the benefit of Unum to redress injuries suffered, and to be suffered, by Unum as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.  Unum is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

136.    Plaintiff will adequately and fairly represent the interests of Unum in enforcing and prosecuting its rights.

137.    Plaintiff was a stockholder of Unum at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Unum stockholder.

138.    The current Board of Unum consists of the following eleven individuals: defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo, and nondefendant Susan D. DeVore.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo Face a Substantial Likelihood of Liability for Their Misconduct**

139.    As alleged above, ten of the eleven current Board members, including Director Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo, violated section 14(a) of the Exchange Act by at least negligently making the

misstatements and omissions in the 2017 Proxy. Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo are responsible for the negligently made statements in the materially misleading 2017 Proxy. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, indemnification provided by the Company to defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo does not protect them for violations of section 14(a) in the 2017 Proxy. As a result, defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo face a substantial likelihood of liability, excusing a demand.

140.  Defendants Caulfield and Larson sold Unum stock under highly suspicious circumstances. These defendants, as directors of Unum, possessed material, nonpublic company information and used that information to benefit themselves. Defendants Caulfield and Larson sold stock based on this knowledge of material, nonpublic company information regarding the Company's woefully inadequate internal controls and the impending decrease in the value of their holdings of Unum. Accordingly, defendants Caulfield and Larson face a substantial likelihood of liability for breach of their fiduciary duties of loyalty. Any demand upon defendants Caulfield and Larson is futile.

141.  In addition, ten out of eleven of the current Board members, including Director Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding: (i) higher claims incidence in the Company's long-term care business; (ii) less favorable policy terminations in its long-term care business; (iii) actuarial miscalculations in the Company's assumptions about its long-term care

business; (iv) the unsustainability of the Company's strategy hiking premiums to offset losses in its long-term car business; (v) the Company's inability to maintain an interest adjusted loss ratio between 85% to 90% as a result of increasing losses and the need to take major reserve charges; and (vi) the Company's lack of effective internal controls over its financial reporting and disclosure controls and procedures.   In making these improper and misleading statements, defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo breached their fiduciary duties.   Accordingly, a majority of the Board faces a substantial likelihood of liability for their breach of fiduciary duties, making demand upon them futile.

142.    Defendants Bunting, Caulfield, Echevarria, Shammo, and Keaney, as members of the Audit Committee, reviewed and approved the improper statements detailed herein.   The Audit Committee's Charter provides that the members must oversee the Company's financial reporting activities, including the Company's Annual Reports, Quarterly Reports, and press releases, accounting standards and principles, and any major issues as to the adequacy of the Company's internal control over financial reporting in light of significant deficiencies or material weaknesses.   Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to Unum's interest adjusted loss ratio and need to take a reserve charge, as well as financial and disclosure controls.   By failing to implement a reasonable information and reporting system to ensure information concerning widespread accounting improprieties were timely shared with upper management and the Board, defendants Bunting, Caulfield, Echevarria, Shammo, and Keaney breached their duties. Moreover, the Audit Committee Defendants failed to assist the Board in overseeing the Company's policies of risk assessment and risk management.   Accordingly, the Audit Committee

Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

143.   As members of the Risk and Finance Committee during relevant times, Director Defendants Caulfield, Echevarria, O'Hanley, and Keaney utterly failed to provide effective oversight of the Company's financial matters and the associated risks of the Company. Particularly, the Risk and Finance Committee Defendants failed to:

> Monitor, evaluate and make recommendations to the Board regarding matters pertaining to the Company's closed block segment, including the long-term care business, to the extent the Committee reasonably believes such matters could or will have a meaningful impact upon any of the investment, capital or financing plans, activities or associated risks for which the Committee has oversight responsibility under this Charter.

These defendants tacitly approved widespread illegal and unethical conduct throughout Unum. As detailed herein, when the truth about Unum's practices was revealed, the Company faced devastating and highly material declines, including, among other things, substantial losses in customer and investor trust and hundreds of millions of dollars of decline in market capitalization. Thus, the Risk and Finance Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

144.   The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations, including GAAP and SEC regulations related to taking reserve charges and revealing material changes in estimates and guidance. Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo face a substantial likelihood of liability for repeatedly failing to comply with this duty. Accordingly, demand upon the Board is excused.

**Demand Is Excused as to Defendant McKenney Because He Lacks Independence**

145.    The principal professional occupation of defendant McKenney is his employment with Unum as CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Accordingly, defendant McKenney lacks independence from defendants Bunting, Caulfield, Echevarria, Egan, Kabat, Keaney, Larson, O'Hanley, and Shammo due to his interest in maintaining his executive position at Unum.  This lack of independence renders defendant McKenney incapable of impartially considering a demand to commence and vigorously prosecute this action.  Unum paid defendant McKenney the following compensation:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2017 | $1,000,000 | $5,720,021 | $2,415,000 | $119,000 | $429,925 | $9,683,946 |
| 2016 | $994,231 | $5,176,835 | $2,100,937 | $84,000 | $315,316 | $8,671,319 |

146.    Plaintiff has not made any demand on the other stockholders of Unum to institute this action since such demand would be futile and useless act for at least the following reasons:

(a)     Unum is a publicly held company with over 218.7 million shares outstanding and thousands of stockholders as of July 27, 2018;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen for Violation of Section 14(a) of the Exchange Act

147.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen.  The section 14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

149.     Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2017 Proxy.  The 2017 Proxy contained proposals to the Company's stockholders that they vote to reelect the members of the Board and approve the Plan to compensate Unum's directors and officers.  By reasons of the conduct alleged herein, defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, Muhl, O'Hanley, Shammo, and Watjen violated section 14(a) of the Exchange Act.  As a direct and proximate result of these violations, stockholders voted in favor of reelecting defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo to the Board and approving the Plan that has dilutive effects.  Defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley,

and Shammo's reelection and the incentives approved under the Plan led to the continuation of the wrongful practices described herein.

150.    Plaintiff, on behalf of Unum, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants McKenney, Bunting, Caulfield, Echevarria, Egan, Godwin, Kabat, Keaney, Larson, O'Hanley, and Shammo based upon the false and misleading 2017 Proxy, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

<u>**COUNT II**</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    The Individual Defendants owed and owe Unum fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Unum the highest obligation of good faith, fair dealing, loyalty, and due care.

153.    The Individual Defendants and each of them violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Unum, and/or consciously failing to prevent Unum from engaging in the unlawful acts complained of herein.

154.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company's long-term care business saw higher claims incidence; (ii) the Company experienced less favorable policy terminations in its long-term care business; (iii) the Company's assumptions about its long-term care business contained actuarial miscalculations; (iv) the Company's

strategy of hiking premiums to offset losses in its long-term care business was unsustainable; (v) the Company was unable to maintain an interest adjusted loss ratio between 85% to 90% as a result of increasing losses and the need to take major reserve charges; and (vi) the Company lacked effective internal controls over its financial reporting and disclosure controls and procedures.   Accordingly, the Officer Defendants breached their duty of care and loyalty to Unum.

155.    Director Defendants, as directors of Unum, owed Unum the highest duty of loyalty.   These defendants breached their duty of loyalty by recklessly permitting the improper stock promotion scheme.   The Director Defendants knew or were reckless in not knowing that: (i) the Company's long-term care business saw higher claims incidence; (ii) the Company experienced less favorable policy terminations in its long-term care business; (iii) the Company's assumptions about its long-term care business contained actuarial miscalculations; (iv) the Company's strategy of hiking premiums to offset losses in its long-term care business was unsustainable; (v) the Company was unable to maintain an interest adjusted loss ratio between 85% to 90% as a result of increasing losses and the need to take major reserve charges; and (vi) the Company lacked effective internal controls over its financial reporting and disclosure controls and procedures.   Accordingly, the Director Defendants breached their duty of loyalty to Unum.

156.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely and utterly failed in their duty of

oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

157.   The Risk and Finance Committee Defendants breached their fiduciary duties by approving and failing to oversee Unum's risk governance framework, risk assessment, and risk management practices.  The Risk and Finance Committee Defendants utterly failed to provide effective oversight of the Company's strategies, policies, procedures, and systems to identify, assess, measure, and manage the major risks facing the Company and its Closed Block segment.

158.   The Insider Selling Defendants breached their duties of loyalty by selling Unum stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was proprietary, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Unum common stock.

159.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Unum has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to Unum.

160.   Plaintiff, on behalf of Unum, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

161.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.   As a result of the Individual Defendants' failure to materially increase its insurance reserves, the Individual Defendants have caused Unum to incur substantial costs.  In

particular, as a direct result of this failure, Unum faces a reported $750 million before-tax GAAP reserve charge for its long-term care business.

163.     In addition, as a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Unum is subject to federal securities class action lawsuits.  The Individual Defendants have caused Unum to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

164.     Furthermore, by failing to conduct proper supervision, the Individual Defendants have caused Unum to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

165.     As a result of the waste of corporate assets, the Individual Defendants are liable to Unum.

166.     Plaintiff, on behalf of Unum, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

167.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Unum.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Unum.

169.     The Insider Selling Defendants sold Unum stock while in possession of material, nonpublic company information that artificially inflated the price of Unum's stock.  As a result,

the Insider Selling Defendants profited from their misconduct and was unjustly enriched through their exploitation of material inside information.

170.     Plaintiff, as a stockholder and representative of Unum, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

171.     Plaintiff, on behalf of Unum, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Unum, demands judgment as follows:

A.     Against the defendants and in favor of Unum for the amount of damages sustained by Unum as a result of the defendants' violation of securities law, breaches of fiduciary duty, aiding and abetting, waste of corporate assets, and unjust enrichment;

B.     Directing Unum to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Unum and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to Unum's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.     a proposal to strengthen Board oversight and supervision of Unum's reserve analysis in its Closed Block segment;

2.     a proposal to strengthen Board oversight and supervision of Unum's accounting practices;

3.      a proposal to strengthen Board oversight and supervision of Unum's business practices;

4.      a proposal to strengthen Unum's oversight of its disclosure procedures to ensure material information is adequately and timely disclosed to the SEC and public;

5.      a proposal to ensure proper oversight of the Company's compliance with all laws and regulations related to its securities;

6.      a proposal to strengthen Unum's controls over financial reporting;

7.      a proposal to control insider selling;

8.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

9.      a provision to permit the stockholders of Unum to nominate at least three candidates for election to the Board.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Unum has an effective remedy;

D.      Awarding to Unum restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 27, 2018

**COOCH AND TAYLOR, P. A.**

*/s/ Blake A. Bennett*

Blake A. Bennett (#5133)
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE 19899
Telephone: (302) 984-3889
Facsimile: (302) 984-3939
E-mail: bbennett@coochtaylor.com

*Attorneys for Plaintiff*

**OF COUNSEL**

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
          csmith@robbinsarroyo.com

RM LAW, P.C.
RICHARD A. MANISKAS
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
E-mail: rmaniskas@rmclasslaw.com